In re COMMONWEALTH OIL REFIN-
ING CO., INC., et al., Debtors.

Nos. SA78CA288, SA78CA293, SA78CA287
and SA78CA290.

United States District Court,
W. D. Texas,
San Antonio Division.

Jan. 4, 1979.

Anthony V. Ponzio, Atty., Securities and Exchange Commission, Chicago, Ill., James T. Eichstaedt, Chief Counsel, Div. of Corporate Regulation, Securities and Exchange Commission, Washington, D. C., Larry R. Patton, Asst. U. S. Atty., San Antonio, Tex., for Securities and Exchange Commission.

Myron M. Sheinfeld, Sheinfeld, Maley & Kay, Houston, Tex., William J. Rochelle, Jr., Rochelle, King & Balzersen, Dallas, Tex., John L. King, Rochelle, King & Balzersen, Dallas, Tex., for Commonwealth Oil Refining Company, Inc. & CRC.

George J. Wade, Shearman & Sterling, New York City, for City Bank, N. A.

Joe Warren Jones, Law Offices of Joe Warren Jones, San Antonio, Tex., for Robert A. Baker, Fiscal Agent.

Randolph P. Tower, Clemens, Spencer, Wellmaker & Finck, San Antonio, Tex., for the Creditors' Committee.

J. Burleson Smith, Cox, Smith, Smith, Hale & Guenther, San Antonio, Tex., for Tesoro Petroleum Corporation.

### ORDER

SPEARS, Chief Judge.

For the sake of clarity and simplicity, a brief review of the chronology of the matters before the Court is in order. On March 2, 1978, Commonwealth Oil Refining Company, and its subsidiaries, hereinafter collectively referred to as "CORCO" or "the debtor," filed petitions for reorganization under Chapter XI of the Bankruptcy Act in the United States District Court for the Western District of Texas. That same day, the bankruptcy court entered an order authorizing the operation of the business by the debtors in possession. On June 9, 1978, the bankruptcy court circulated a notice to all parties in interest which stated, in pertinent part, as follows:

If authorized by its Board of Directors, Commonwealth Oil Refining Company, Inc. may present, and the Court may hear, an application for an order authorizing employment of and compensation for reorganization management for the Debtors.

On June 22, 1978, the Securities and Exchange Commission, hereinafter referred to as "the SEC" or "the Commission", filed an application to stay certain applications of the debtor and the court-appointed fiscal agent, including the debtor's application for an order authorizing employment of and compensation for reorganization management. At the same time, the Commission filed a motion to have CORCO's Chapter XI case proceed under Chapter X.

The debtor filed its application for authority to enter into a management agreement with Commonwealth Reorganization Company, Inc., hereinafter referred to as "CRC", on June 28, 1978. At the same time, the bankruptcy court was asked to postpone action on the management contract by Peerless Petrochemical, Inc. and Peerless Petrochemical (Puerto Rico), Inc., as representatives of the holders some 660,000 shares of common stock and $580,000 principal amount of convertible debentures issued by the debtor.

On July 19, 1978, the debtor filed a first amended application for authorization to enter into a management agreement. A hearing was held on the application that same day, and on July 20, 1978, an order was entered denying the SEC's application to stay the debtor's application for authority to enter into a management agreement, and a separate order was entered authorizing the debtors and CRC, to enter into such an agreement.

On July 27, 1978, the Commission filed its notice of appeal from the bankruptcy court's denial of its application to stay the entry into the management agreement. This appeal was given District Court cause number SA 78 CA 288. On August 28, 1978, the SEC filed a motion in this Court for a stay of the incurrence of further obligations under the contract between debtors and CRC, pending determination of the Commission's motion to have the case proceed under Chapter X (currently set for hearing in March of 1979), or of the Commission's appeal from the bankruptcy court's order of July 20, 1978 authorizing the debtors to enter into the management contract. This motion was filed as a separate proceeding, number SA 78 CA 293, but upon motion of the SEC the brief filed in support of the motion is also to be considered as the Commission's brief in SA 78 CA 288. In this proceeding, the SEC seeks 1) to overturn the bankruptcy court's denial of a stay of the contract between CORCO and CRC, and 2) to have this Court stay the incurrence of further obligations under the contract. As grounds for the relief requested, the SEC takes the position that the bankruptcy court's authorization to CORCO and CRC to enter into the management agreement conflicts with the relief sought

in the Commission's motion to transfer the case to Chapter X. The SEC points out that under § 167(1) of the Bankruptcy Act, a Chapter X trustee is given the authority to

> investigate the acts, conduct, property, liabilities, and financial condition of the debtor, the operation of its business and the desirability of the continuance thereof, and any other matter relevant to the proceeding or to the formulation of a plan, and report thereon to the judge.

In the CORCO Chapter XI, it is argued, the court has authorized the appointment of a fiscal agent, whose duties include examination into the debtor's past conduct, and a reorganization management team, which is empowered to evaluate the debtor's chances for rehabilitation or reorganization and, in addition, is given authority to recruit additional management personnel for the debtor and to assist in the management of the debtor. These two offices, it is alleged, are being employed at the behest of the secured creditors to perform functions of a Chapter X trustee while the debtor is in Chapter XI, thus protecting the interests of the secured creditors from adjustment under the more comprehensive reorganization provisions of Chapter X. Several consequences are alleged to flow from this circumstance. Primarily, the Commission is concerned about accountability and cost. It is argued that CRC is subject to the supervision of only the debtor and its board of directors, and that the functions it is authorized by the Court to perform should be conducted not by a debtor-supervised entity, but by a disinterested trustee subject to supervision by, and accountable only to, the bankruptcy court. In this regard, CRC is empowered to seek out and employ management-level personnel under long-term contracts, which the Commission fears will leave a Chapter X trustee, if one is appointed, saddled with large management salary obligations without having a voice in the selection of the individuals in the positions. In this connection it should be noted that while CRC itself has been authorized to exercise some management authority under Phase II, its function under Phase I is primarily to study, consult, and advise the debtor as to its strengths and weaknesses, and to recommend improvements. As a corollary function, it may assist in the recruitment and training of managers and executives for the debtor.[1] It appears to the Court that no

---

1. CRC's duties are divided into two phases: Phase I commenced on July 20, 1978, to continue for five months after the effective date of the Agreement. During this phase CRC was charged with developing a report setting forth its conclusions (and the reasons therefor) as to the potential for Corco's economic viability. These conclusions are embodied in First Phase Report, presented on December 18, 1978 to the CORCO Board of Directors and then to the Court and the Creditors' Committee.

The activities to be undertaken by CRC during Phase I were detailed in the Management Agreement as follows:

1. To immediately retain the services of additional personnel needed to round out the reorganization management team;

2. To obtain the services of analysts and experts in the fields of product marketing, accounting, financial controls, and engineering necessary to develop a credible business forecast and to devise programs and plans for implementing long-range objectives;

3. To perform analyses, audits, and reviews of all aspects of CORCO's operations;

4. To analyze findings and determine whether CORCO can be developed and maintained as a viable economic entity;

5. To coordinate activities with CORCO's management and to provide management and operational assistance, direction, and advice necessary to remedy management and operational problems identified by CRC, and to implement corrective actions recommended by CRC. Also, to provide such additional services as the CORCO Board, or the Court, may require during Phase I.

6. To report periodically to the CORCO Board, the Court, and the Creditors' Committee on Phase I activities;

7. To render any special interim reports on Phase I activities, on the identified problems of CORCO, and on recommendations for corrective actions, that may reasonably be requested by the CORCO Board, the Court, or the Creditors' Committee and

8. To take any and all such other actions as CRC and the CORCO Board may deem necessary or desirable to CRC's effective performance of duties and functions during Phase I.

The Management Agreement further provides that, if CRC finds that CORCO cannot be maintained as a viable economic entity, Phase I shall conclude and CRC's function shall cease.

In the event that CRC reports that CORCO can be maintained as a viable economic entity,

statutory provision prevents a Chapter XI court from authorizing the employment of a company such as CRC to study and supplement the existing management of a debtor and recruit individuals to fill positions which are vacant, as is the case with COR-CO. To hold otherwise would lead to the conclusion that every corporate debtor that lost a significant number of its managers prior to or during a Chapter XI proceeding would *ipso facto* be forced into a Chapter X proceeding. The Court does not find this to be mandated by any of the provisions of the Bankruptcy Act or Rules.

Much of the Commission's argument is directed toward the differences between Chapters X and XI of the Bankruptcy Act and the effect employment of CRC and accrual of CRC's right to a bonus or incentive payment will have on the bankruptcy court's ruling on their motion to transfer the case to Chapter X and, if that motion is successful, what position a trustee will be in relative to the CRC personnel.[2] The Court does not view this consideration as one so critical as the SEC would have the Court believe it is. In the first place, it is not disputed by any party to the proceeding that CORCO needed additional management personnel at the time the contract was executed, or that it continues to need

additional qualified managers and executives in crucial positions in the company. When the company moved its headquarters from New York to San Antonio, it lost nearly half of its managers and executives. Since the move, the staff has remained depleted. CRC's function as an independent contractor is to fill in gaps in the management, and recruit new managerial and executive talent. The Commission has repeatedly expressed concern that the functions of CRC will overlap with those of present management, thus burdening the estate with duplicative management efforts. The Commission also initially pointed out that as it was originally constituted, CRC was authorized to employ a set of lawyers and accountants separate from those retained by the fiscal agent, the creditors' committee and the debtor, in furtherance of its analysis and reporting function. However, the threat of duplication in employment of accountants has to some extent been remedied by order of the bankruptcy court, and this Court feels certain that all possible efforts are being made by the Court below to keep the administrative costs of the CORCO Chapter XI proceeding at a minimum. And from the standpoint of CRC, it seems inconceivable that a corpora-

Phase II will commence and CRC shall (1) continue to perform the services begun in Phase I, as detailed in Item Five above, (2) assist in the preparation of a plan of arrangement or reorganization, (3) recommend to the CORCO Board and the Court any revisions and changes which in CRC's opinion are needed to implement its recommendations and achieve the objectives and goals set forth in the plan of arrangement or reorganization, and (4) perform the Phase II services set out below.

The focus of activity of CRC during Phase II will be:

1. To assist in preparing a plan of arrangement or reorganization for presentation to the Court and to those creditors of CORCO whose acceptance is required by law;

2. To provide CORCO with the management services and advice it requires to implement CRC's recommendations;

3. To recruit and assist in the development and retention of internal management within CORCO needed to ensure the company's long-term growth;

4. To take any and all such other actions as CRC and the CORCO Board deem necessary or

desirable to effectively perform Phase II duties and functions;

5. To report periodically to the CORCO Board, the Court, and the Creditors' Committee on Phase II activities; and

6. To render any special interim reports in Phase II activities, on identified problems of CORCO, and on recommendations for corrective actions that may reasonably be requested by the CORCO Board, the Court, or the Creditors' Committee.

2. The management agreement approved by the bankruptcy court calls for a bonus or incentive payment in an amount potentially as high as $2.9 million to be made to CRC if it enters into Phase II of the contract. CRC filed its Phase I report on December 18, 1978, and under the terms of the agreement, since the report concluded that CORCO can be maintained as a viable economic entity, Phase II automatically commenced. The accrual of CRC's right to any bonus payment, however, has not yet become vested, and remains contingent upon the fulfillment of several specific conditions enumerated in the contract.

tion spawned for the specific purpose of identifying ways and means of regenerating a financially ailing corporate debtor would not have as its highest priority the eradication of wasteful duplication at all levels of the corporation and at all levels of corporate expenditure. CRC is, after all, being offered a substantial "success bonus" as a reward for its services, and to assume that it would nurture duplication would be to assume that it wished to cut its own throat.

One of the SEC's arguments on the motion for a stay is already moot. The Commission contended that CRC was formed at the behest of the secured creditors, whose rights can only be affected in Chapter XI by an out of court voluntary compromise between themselves and the debtor, to have a study of the ills and prognosis for economic survival of CORCO at the expense of the estate. This has already been done, and the prognosis is that CORCO can, with the confluence of several important factors, work its way out of its current financial problems.

The main problem before the Court is whether the existence and efforts of CRC will interfere with the powers and responsibilities of a Chapter X trustee if the Commission's motion to transfer is granted. Although the president of CRC was selected with the advice and consent of the debtor and the major secured creditors, it is not realistic to assume that his loyalty to the debtor or to the secured creditors would affect his attitude toward a trustee if one should be appointed. And to assume that CRC is staffed with incompetents or individuals who would automatically be unacceptable to a trustee, or who would attempt to thwart his efforts to reorganize the debtor, is not realistic. In addition, it is undisputed by the SEC that CORCO needs the advice and management assistance, and the Court has not been made aware of any failure of CRC to perform its duties under the contract. While it is true that there is no specific portion of Chapter XI of the Bankruptcy Act which authorizes the formation and employment of a "reorganization management team", by the same token, there is no specific prohibition, either expressed or implied, against it.

 In summary, the Court believes the bankruptcy court's statement in its July 20, 1978 order denying the SEC's application to stay entry into the management agreement is correct; to wit:

(a stay) is not in the best interest of the administration of the Chapter XI estates, is not in the Debtor's best interest and is not in the best interest of the Debtor's creditors.

The SEC has failed to show the error in this statement. In order for it to prevail on the motion to stay, the Commission must show 1) there is a strong likelihood that the SEC will prevail on its appeal to this Court from the bankruptcy court's order authorizing the debtor's entry into the management agreement, 2) irreparable injury will result if a stay is not granted, 3) the issuance of a stay will not substantially harm other parties interested in the proceedings, and 4) the public interest supports such a stay. *Washington Metropolitan Area v. Holiday Tours*, 182 U.S.App.D.C. 220, 222, 559 F.2d 841, 843 (1977).

In order to evaluate the first of these factors, the merits of the consolidated appeal of the SEC and Peerless Petrochemicals, Inc., SA 78 CA 287 and SA 78 CA 290, must be examined. The arguments advanced in support of the appellants' position are the same as those relied on by the SEC in its motion to stay. They first contend that the contract conflicts with the relief sought by the Commission's motion to transfer the proceedings to Chapter X. The Commission characterizes the bankruptcy court's approval of the CRC contract as approval of an alternative to a transfer of the proceedings to Chapter X. The Court fails to see why CRC could not function under a trustee as readily as it presently functions under the guidance of the debtor. It remains undisputed that the debtor needed the type of services offered by CRC immediately, and should not be left to flounder in the interim period between the filing of the Commission's motion and a determination thereof.

The Commission also claims that the contract is inconsistent with a Chapter XI proceeding. They argue that the debtor, with the approval of the bankruptcy court, has let a contract to CRC which confers on it the rights and powers of a trustee; i. e., to study and report. However, the fact that the bankruptcy court authorized a study of the debtor while it was in Chapter XI does not mean that it is predisposed to retain the proceeding in that Chapter. The SEC has failed to show that the CRC contract is unauthorized or inconsistent with Chapter XI.

The threat of irreparable injury to the estate or the parties if a stay is not granted is similarly elusive. The bankruptcy court found, on the basis of the evidence presented to it at the July 19, 1978 hearing, that entry into the agreement would "provide maximum benefit and lessen the potential for irreparable harm to the Debtor, its creditors, and its estate." The record amply supports that finding. The Commission claims that junior equity interests will suffer, but neither Tesoro, a holder of 37% of such interests, nor the Official Creditors Committee has voiced any objection at all to CRC's employment.

As a matter of fact, it would appear that the grant of a stay would probably harm other interested parties in the proceeding, the debtor in particular. CORCO needs the services of CRC, and in order to secure the services of "top-flight" personnel, CRC must have substantial funds to pay them and a prospect of some security to offer them. The SEC has failed to prove that no harm would result to the debtor and/or other interested parties, if its motion to stay is granted.

The final factor to be considered, to wit, that the public interest is threatened by the "debtor's attempt to evade compliance with statutory limitations on the use of Chapter XI of the Act," is without merit, because the contract between CORCO and CRC is not, in the opinion of this Court, inconsistent with any limitations on the use of Chapter XI. It is, therefore,

ORDERED that the motion to stay incurrence of further obligations under the contract between CORCO and CRC be, and the same is hereby, DENIED. It is further ORDERED that the stay entered by the Court on December 14, 1978 be, and the same is hereby, DISSOLVED. The order of the bankruptcy court dated July 20, 1978, denying the SEC's motion to stay entry into the management agreement, is hereby AFFIRMED.

It is further ORDERED that the bankruptcy court's order of July 20, 1978, which authorized CORCO to enter into a management agreement with CRC, currently before the Court in cause numbers SA 78 CA 287 and SA 78 CA 290 be, and the same is hereby, in all respects, AFFIRMED for the reasons set forth above.